## MAYOR AND COUNCIL OF MOUNT AIRY *v.* SAPPINGTON ET UX.

[No. 112, October Term, 1949.]

*Decided May 10, 1950.*

The cause was argued before MARBURY, C. J., DELA-PLAINE, COLLINS, GRASON, HENDERSON and MARKELL, JJ.

*Stanford Hoff*, with whom were *Sponseller & Hoff* and *L. Pearce Bowlus* on the brief, for the appellant.

*D. Eugene Walsh* and *Charles O. Fisher* for the appellees.

MARKELL, J., delivered the opinion of the Court.

This is an appeal from a decree holding invalid, and enjoining defendant from enforcing, an ordinance approved March 7, 1949, which purports to make it "unlawful for any person to erect, maintain or operate a slaughterhouse or animal killing shed within the corporate limits of Mount Airy." The only question presented is whether the ordinance is valid or is *ultra vires* of the municipality. Plaintiffs propose to construct, "maintain and operate a plant for the killing and processing of certain livestock" in connection with the operation of "a locker refrigerator plant" which they "have been operating" for several years on their land in Mount Airy, "all of which [is] to be done in strict compliance with the state requirements" for the construction and operation of such a plant. Shortly after they informed the Mayor of "the contemplated construction and operation", the ordinance was passed and approved.

Mount Airy is a town of about 800 inhabitants in Carroll and Frederick Counties. It was incorporated by Chapter 91 of the Acts of 1894. Its charter was re-

vised and rewritten by Chapter 341 of the Acts of 1900 and amended by Chapter 785 of the Acts of 1906. Under section 1, N of the Act of 1900 the municipality has "power to pass all ordinances necessary within the limits of said town to preserve the health, peace and safety of the inhabitants thereof; to prevent and remove nuisances and annoyances; * * *"; under section 1, O, "to regulate or prevent the going at large within the corporate limits of horses, cattle, sheep, goats, swine, geese or any other brute or fowl or beast; * * *"; under section 2 of the Act of 1906, "to suppress and remove all nuisances affecting or liable to affect the peace, quiet or health of the town"; and under section 3 of the Act of 1906 very limited zoning power to "make reasonable regulations in regard to buildings to be erected in said town and grant building permits for the same; to establish five districts in said town and regulate the kind of materials used in the erection of buildings within such districts, with special reference to the prevention and suppression of fires". P. L. L. 1930, Art. 7, secs. 223, 224, 236, 237. Manifestly power under the Act of 1906 to "suppress and remove" specified nuisances is no broader than general power under the Act of 1900 to "prevent and remove" nuisances. Power to prevent animals from going at large is not power to prohibit keeping and slaughtering animals. Nor is power to regulate locations power to prohibit. By Chapter 731 of the Acts of 1947 every incorporated municipality, except Baltimore, is given express power "to regulate slaughter houses, packing houses and all places where offensive trades may be carried on." Code 1947 Supp., Art. 23A, "Corporations—Municipal", sec. 2 (16). Such power to regulate is not power to prohibit. A slaughterhouse is not a nuisance *per se*. *Burley v. City of Annapolis*, 182 Md. 307, 312, 34 A. 2d 603.

Thus the question is whether power to "prevent and remove nuisances" includes power to prohibit slaughterhouses. By repeated decisions of this and other courts for more than eighty years this question has been answer-

ed in the negative. As recently as 1935, 1946 and less than a month ago this court has applied the rule "that municipal corporations have only such powers as have been conferred upon them by the Legislature, and these are to be strictly construed. To doubt such a power in a given case is to deny its existence." *Hanlon v. Levin,* 168 Md. 674, 677, 179 A. 286; *Mayor & City Council of Baltimore v. Canton Co.,* 186 Md. 618, 631, 47 A. 2d 775; *Duvall v. Lacy,* 195 Md. 138, 73 A. 2d 26

The law on the specific question of power to prevent and remove nuisances is concisely stated by Judge Dillon, quoting the opinion, by Mr. Justice Miller, in *Yates v. Milwaukee,* 10 Wall. 497, 505, 19 L. Ed. 984, which has frequently been quoted or cited, and followed, by this court. "It is to secure and promote the public health, safety, and convenience that municipal corporations are so generally and so liberally endowed with *power to prevent and abate nuisances.* This authority and its summary exercise may be constitutionally conferred on the incorporated place, and it authorizes its council to act against that which comes within the legal notion of a nuisance; but such power, conferred in general terms, cannot be taken to authorize the extra-judicial condemnation and destruction of that as a nuisance which, in its nature, situation, or use, is not such. Speaking upon this subject in a *very important* case, where a city, under authority to prevent and restrain encroachments on rivers running through it, commenced a summary proceeding *to remove a private wharf,* an eminent judge uses this language: 'But the mere declaration by the city council that a certain structure was an encroachment or obstruction did not make it so, nor could such declaration make it a nuisance unless it in fact had that character. It is a doctrine not to be tolerated in this country that a municipal corporation, without any general laws either of the city or of the state within which a given structure can be shown to be a nuisance, can, by the mere declaration that it is one, subject it to removal by any person supposed to be aggrieved, or even by the city itself.

This would place every house, every business, and all the property in the city, at the uncontrolled will of the temporary local authorities.' " (Italics in the text.) *Dillon on Municipal Corporations,* (5th Ed.) § 684, quoting *Yates v. Milwaukee,* 10 Wall. 497, 19 L. Ed. 984. This statement by *Dillon* was also supported, in the first edition (1872), by earlier cases, including English and American slaughterhouse cases.

At the time of *State v. Mott,* 1884, 61 Md. 297, 48 Am. Rep. 105, the Baltimore charter conferred power "to prevent and remove nuisances" and also to "regulate the places for * * * the erecting of slaughter-houses and distilleries, and where every other offensive trade is carried on." The court, by Chief Judge Alvey, cited this section of *Dillon* (§ 374 in the 3d. Ed., 1883) in support of a statement, "Here the power conferred by the statute and attempted to be exercised by the general prohibitory ordinance, cannot be taken to authorize the extra judicial condemnation and destruction of that as a nuisance, which, in its nature, situation or use, is not or may not be such." 61 Md. 307, 48 Am. Rep. 105. *State v. Mott* was followed in *Jewel Tea Co. v. Town of Bel Air,* 172 Md. 536, 539-540, 192 A. 417. The language of Mr. Justice Miller quoted by Judge Dillon has been quoted or cited in *New Windsor v. Stocksdale,* 95 Md. 196, 215, 52 A. 596; *Frostburg v. Wineland,* 98 Md. 239, 244, 56 A. 811, 64 L. R. A. 627, 1 Ann. Cas. 783; *Frostburg v. Hitchins,* 99 Md. 617, 627, 59 A. 49; *Hagerstown v. Baltimore & Ohio R. R. Co.,* 107 Md. 178, 188, 68 A. 490, 126 Am. St. Rep. 382; *Burley v. City of Annapolis,* 182 Md. 307, 314, 34 A. 2d 603; *Mayor and Councilmen of Frostburg v. Sleeman,* 185 Md. 393, 397-398, 45 A. 2d 113.

It has been suggested that § 690 of *Dillon on Municipal Corporations* (5th Ed.) supports the claim of corporate power in the municipality of Mount Airy to prohibit slaughterhouses. The first sentence in § 690 shows that it is applicable only to broader corporate powers than those mentioned in § 684 or conferred by the Mount Airy charter, *viz.,* "Under statutory authority conferred upon

a municipal corporation to *declare* and to *abate* and *remove nuisances,* the acts and things which may be the subject of the exercise of the power have, for some purposes and in some jurisdictions, been divided into three classes." (Italics in the text.) In the fifth edition of Dillon § 684, but not § 690, is supported by Maryland cases, obviously because the Maryland municipal charters which have been construed by this court have usually conferred power to "prevent and remove", not to "declare and remove", nuisances. Strange to say, by the Hagerstown charter in the Code of 1860 (P. L. L. Art. 21, sec. 126), power was conferred to cause "to be abated or removed * * * all nuisances, whether such at common law or so declared by any ordinance of said town," but when the charter was revised by the Act of 1886, Ch. 409, P. L. L. (1888), Art. 22, sec. 171, (if not earlier), this unusual grant of power was supplanted by the more usual language quoted in *Hagerstown v. Baltimore & Ohio R. R. Co., supra.* If any Maryland municipal charters contain grants of power to "declare" nuisances, such grants have not come before this court for construction.

In the Mount Airy charter the power to "prevent and remove nuisances" is expressed in the same words as in the Annapolis charter *(Burley v. City of Annapolis, supra,* 182 Md. 313, 34 A. 2d 603), and the original Baltimore charter, Acts of 1796 ch. 68, sec. 9; *(State v. Mott, supra)* and substantially the same as in the Hagerstown charter from 1886 to 1918, *(Hagerstown v. Baltimore & Ohio R. R. Co., supra,* 107 Md. 187, 68 A. 490, 126 Am. St. Rep. 382), and the charters of most Maryland municipalities. Examination of a few of the many Maryland municipal charters indicates that most of the larger cities and towns by expansion of former narrower grants of power or by additional grants, have been expressly authorized to prohibit slaughterhouses, hog pens or any "noxious trades" within the municipal limits. Since 1898 the Baltimore charter has expressly delegated "all the power commonly known as the police power

266

to the same extent as the State has or could exercise said power" within the limits of Baltimore. Baltimore Charter (1949 Ed.) Sec. 6 (24). Since 1918 Hagerstown has had power to provide for the regulation and location or the "removal from the corporate limits" of "all stock yards, cattle pens, hog pens and slaughter houses." Act of 1918, ch. 41, sec. 171. Cumberland under the Act of 1878, ch. 484, P. L. L. (1888), Art. 1, sec. 63, had power "to prevent the keeping of any hog-pen within certain limits or wards within the city", but under the Act of 1922, ch. 96, sec. 47 P. L. L. (1930), Art. 1A, sec. 47, it has power to "regulate the location and management of * * * slaughter houses * * * all other establishments of which the business or trade may become noxious or injurious to public comfort and health; to prohibit the erection of such buildings or the continuance of such noxious injurious occupations therein, whenever the public health or comfort requires it". Under the Code of 1860 Chestertown had power to "prevent and remove all nuisances" (P. L. L., Art. 14, sec. 42) and "if any person shall butcher any cattle, sheep or hog within said town, except in such part thereof as shall be approved by said commissioners he shall be fined five dollars." Under the Act of 1888, ch. 227; P. L. L. (1930), Art. 15, sec. 97, the town has power "to prohibit and suppress the keeping of hogs or shoats, slaughter houses, fertilizer factories, or houses for the storage of fertilizers, within the town limits." Under the Act of 1888, ch. 186, (P. L. L. (1888), Art. 23, sec. 146) Salisbury has power "to prevent, remove and abate all nuisances" in or upon the streets or lots; under the Act of 1912, ch. 636, it has power to "regulate or suppress slaughter houses and smoke houses", to "regulate, restrain or prohibit the running at large of horses, bulls, cows, sheep, goats, ducks, geese and chickens" on the streets, and under the Act of 1927, ch. 138, power to "regulate all stock-yards, cattle pens, hog pens and slaughter houses" within the city or "provide for their removal from the corporate limits." P. L. L. (1930), Art. 23, sec. 293. Ever since

the Code of 1860, (P. L. L. Art. 11, sec. 110), Frederick has had power to pass laws and ordinances to "prevent and remove nuisances". P. L. L. (1930), Art. 11, sec. 283. *Cf.* Art. 11, sec. 296; Act of 1910, ch. 51. Under the Act of 1908, ch. 560, it has power to "prohibit or regulate the keeping of swine, hogs and pigs", and "prohibit or regulate slaughter houses", within the corporate limits, after a referendum before exercising these powers. P. L. L. (1930), Art. 11, sec. 301. Since the Code of 1860, (P. L. L., Art. 7), Westminster has had power to "prevent and remove nuisances", sec. 107 and to "regulate or prevent swine going at large" (sec. 118) ; under the Act of 1910, ch. 341, P. 690, it has power to "prevent the running at large * * * of horses, cattle, hogs, geese and any other beast, brute or fowl, and regulate or prevent the keeping of the same within said city" (P. L. L. (1930), Art. 7, sec. 531) and also "to regulate or exclude places where offensive trades or any offensive occupation is conducted or engaged in; to regulate or exclude pig pens * * *; to regulate or exclude slaughter houses within the corporate limits". P. L. L. (1930), Art. 7, sec. 534. From testimony and from remarks of Judge Boylan at the hearing in the instant case, it appears that Westminster has not exercised its power to "exclude slaughter houses". It is unnecessary to elaborate the contrast between the express powers of Chestertown since 1888, and the more recent express powers of Baltimore, Cumberland, Hagerstown, Frederick, Salisbury and Westminster, on the one hand, and the much narrower former powers of the same municipalities and the present narrow powers of Mount Airy.

It is contended that slaughterhouses are *prima facie* nuisances, (*Woodyear v. Schaefer,* 57 Md. 1, 40 Am. Rep. 419), and therefore can be prohibited under power to "prevent and remove nuisances." Whether a thing or a condition is *prima facie* a nuisance is a matter of evidence, pertinent to judicial determination whether it is in fact a nuisance, but not pertinent to the question of power to prohibit it by municipal fiat, without judicial

determination. The question whether plaintiffs can lawfully construct and operate their proposed slaughterhouse is not before us. If before or after it is erected the proposed slaughterhouse can be shown to be, by reason of location or otherwise, or after it is erected it can be shown to be, by reason of manner of construction or operation, a nuisance, the municipality or a property owner specially damaged can enjoin its erection or its maintenance and operation. If it is *prima facie* a nuisance, it may be easier to show it an actual nuisance. Without resort to the courts the municipality has no present power to prohibit any slaughterhouse anywhere in Mount Airy.

*Decree affirmed, with costs.*

MARBURY, C. J., filed the following dissenting opinion in which COLLINS, J., concurred.

The question whether an ordinance prohibiting a slaughter-house anywhere in Mount Airy (or in any other similar community) is *ultra vires* of the municipality has *never* been before this Court, and has *not* been answered by it, either in the affirmative or in the negative, "for more than eighty years" or for any other period of time.

The Maryland cases from *Glenn v. Mayor, etc., Baltimore*, 1833, 5 Gill & J. 424, to *Mayor and Councilman of Frostburg v. Sleeman*, 1945, 185 Md. 393, 45 A. 2d 113, were not concerned with slaughter-houses or any similar kinds of nuisances. They dealt with things, not usually nuisances, which the municipalities sought to make nuisances by their unauthorized declarations, and then to prohibit. This Court has uniformly held that this cannot be done, that, *by the simple declaration of town authorities*, a thing not ordinarily a nuisance cannot be made one, if it is not one in fact, and therefore it cannot be summarily prohibited. But the cases so holding were not considering slaughterhouses.

The case relied on and quoted or referred to by many of them is *Yates v. Milwaukee*, 10 Wall. 497, 19 L. Ed.

984.   In that case the city had attempted to prevent an individual from building a *wharf* by declaring it to be a nuisance.   In *Glenn v. Baltimore, supra,* what was sought to be prohibited was a *turpentine distillery.*   In *Adams v. Michael,* 38 Md. 123, 17 Am. Rep. 516, it was a *factory for the manufacture of felt roofing.* In *State v. Mott,* 61 Md. 297, 48 Am. Rep. 105, *Limekilns.*   In *New Windsor v. Stocksdale,* 95 Md. 196, 52 A. 596, a *boardwalk and drain.*   In *King v. Hamill,* 97 Md. 103, 54 A. 625 a *private stable.*   In *Frostburg v. Wineland,* 98 Md. 239, 56 A. 811, 64 L. R. A. 627, 1 Ann. Cas. 783, *shade trees.*   In *Frostburg v. Hitchins,* 99 Md. 617, 59 A. 49, *structure across an alley.*   In *Hagerstown v. Baltimore and Ohio Railway,* 107 Md. 178, 68 A. 490, 126 Am. St. Rep. 382, a *stock yard.*   In *Jewel Tea Co. v. Town of Bel Air,* 172 Md. 536, 192 A. 417, *door to door solicitation of customers.*   In *Burley v. Annapolis,* 182 Md. 307, 34 A. 2d 603, a *pool room and gambling establishment.*   In *Frostburg v. Sleeman, supra* a *raised sidewalk.*

Slaughter-houses have always been in a different class from these things which are ordinarily innocuous and harmless.   Slaughter-houses are presumptively or *prima facie* nuisances.   2 Kent Com. 340, Slaughter House Cases, 16 Wall 36, 21 L. Ed. 394; *Butchers' Union etc. Co. v. Crescent City etc. Co.,* 111 U. S. 746, 4 S. Ct. 652, 28 L. Ed. 585, *Dillon on Municipal Corporations,* 5th Ed. Vol. 2, Section 690, *Joyce Law of Nuisance,* paragraph 126 *et seq.*; Wood on Nuisances, Sec. 504; *Woodyear v. Schaefer,* 57 Md. 1, 40 Am. Rep. 419, *Sitterle v. Victoria Cold Storage Co.,* Tex. Civ. App., 33 S. W. 2d 546 and numerous authorities therein quoted.

Since that fact is universally recognized, and is not disputed, it was not necessary for the municipal authorities of Mount Airy to *declare* slaughter-houses to be nuisances, present or prospective.   They are already *prima facie* or potential nuisances.   As a matter of fact, the town authorities made no such declaration.   They have express authority from the legislature to suppress and remove all nuisances affecting or *liable to affect*

the peace, quiet or health of the town, Act of 1906, Chapter 785, Code P. L. L. (Art. 7, Section 236, page 1797). They have exercised that authority by the passage of the ordinance in question which prohibits these presumptive nuisances from invading the town. There has been no previous decision of this Court which denies them that right. It requires an unwarranted stretching of the cases above mentioned to reach any such conclusion.

The opinion of the majority of the Court indicates that the remedy is to wait until after the proposed slaughterhouse of the appellees is erected and is in operation. If then it is shown to be a nuisance, the municipality can enjoin its maintenance. To so hold is to ignore the realities of the situation. It is not necessary to sit by until the appellees have completed their investment, and until the cries of the dying animals are heard, the blood begins to flow, and the disposition of the offal commences. The town can reasonably and lawfully anticipate the result discussed by Chancellor Kent, by the Supreme Court of the United States, by this Court, by the textbook writers previously mentioned and by the Texas Civil Court of Appeals and the authorities cited by it. There is nothing else the legislature could have intended when it authorized the Mount Airy authorities to "remove" nuisances "liable to affect" conditions in the community. A *prima facie* nuisance is one "liable to affect" adversely peace, quiet, and health. The town has acted under specific authority given it in its Charter. The ordinance should be upheld, and the decree reversed.

Judge COLLINS authorizes me to state that he concurs in this opinion.