DUVALL ET AL. *v.* LACY, COMPTROLLER
[No. 141, October Term, 1949.]

*Decided April 14, 1950.*

The cause was argued before MARBURY, C. J., COLLINS, GRASON, HENDERSON, and MARKELL, JJ.

*Emanuel Klawans* and *F. Neal Parke,* with whom was *Louis M. Strauss* on the brief, for the appellants.

*J. Edgar Harvey, Deputy Attorney General,* with whom was *Hall Hammond, Attorney General,* on the brief, for the appellee.

MARBURY, C. J., delivered the opinion of the Court.

Appellants filed a petition for a writ of mandamus against the Comptroller of the State, alleging that he was about to remove the income tax division of his office from Annapolis to the City of Baltimore, in violation of Article VI, Section 1, of the Constitution of Maryland. They allege that the rental of office space for this division in Baltimore will constitute a diversion of public monies to an unlawful use, that there is now available ample space and adequate facilities for the division in the State Office Building in Annapolis, and if added space is wanted it can be obtained in that City. The Comptroller demurred, the lower court sustained the demurrer and dismissed the petition, and from its order petitioners appeal here.

The petitioners in the writ are the Mayor and Aldermen of the City of Annapolis, a municipal body corporate, and two individuals. The petition states that the corporation brings this suit on behalf of itself and of all citizens, residents, voters and taxpayers of the State, county and City. One of the individual petitioners is Frank M. Duvall, a citizen, resident, voter and taxpayer of the State and of Anne Arundel County, and he brings the suit as well on behalf of all others similarly situated. The other individual petitioner is the Mayor of Annapolis, who is also alleged to be a citizen, resident, voter and taxpayer of the State, county and City, and a merchant engaged in business in Annapolis, and he also brings the suit as well on behalf of all others similarly situated.

Municipal corporations have only the powers conferred upon them by the Legislature, and these are to be strictly construed. "To doubt such power in a given case is to deny its existence." *Hanlon v. Levin,* 168 Md. 674, 179 A. 286, 287, *Mayor & City Council of City of Baltimore v. Canton Company,* 186 Md. 618, 631, 47 A. 2d 775. We have held that it is implicit in the authority of such a corporation to take necessary legal action to put in force its ordinances or any amendment to its charter, *Board of Education of Frederick County v. Mayor & Aldermen of Frederick,* 194 Md. 170, 69 A. 2d 912, but we know of no authority given to the corporate appellant in this case to ask for a construction of the Constitution of the State, or to require a state official to carry out what it claims to be the mandatory instruction of that document. There is no allegation in the petition of any special benefit to the City of Annapolis from a retention there of the Income Tax Division, and if there were, we know of no ground on which the municipal authority could legally enforce such benefit. It has become customary in recent years for municipalities to advertise the particular advantages of their communities so as to attract industries, but the right to bring suit is quite another thing. The individual taxpayers, Duvall and McCready, have a somewhat better standing. Taxpayers, in this State, have frequently been allowed by class suits to restrain the improper expenditures of public funds. This may in some cases be permissible even though the acts complained of are profitable to the public. *Hanlon v. Levin, supra; Green v. Garrett,* 192 Md. 52, 63 A. 2d 326. There is no showing in the petition whether the objected action of the Comptroller will be beneficial from a financial standpoint or not, and this Court has recently denied the right of taxpayers to test the constitutionality of a statute unless they have some special interest in it. *Hammond v. Lancaster,* 194 Md. 462, 71 A. 2d 474. The appellee, however, does not raise the question of the rights of any of the petitioners to bring the suit, and we refer to it only because we do not wish to indicate that there

exists an unrestricted right in any taxpayers or bodies of taxpayers to bring any sort of proceeding they may think should be instituted. For the purposes of this particular case, we will pass the question and proceed to the main issue.

Article VI, Section 1 of the Constitution, provides for a Treasury Department consisting of a Comptroller, to be elected and a Treasurer to be appointed by the Legislature. In the last part of the section is the statement, "The Comptroller and the Treasurer shall keep their offices at the seat of government." The duties of the Comptroller are set forth in Section 2 of Article VI. He is to have the general superintendence of the fiscal affairs of the State, to digest and prepare plans for the improvement and management of the revenue and for the support of the public credit; prepare and report estimates of the revenue and expenditures of the State; superintend and enforce the prompt collection of all taxes and revenue; adjust and settle with delinquent collectors and receivers of taxes; preserve all public accounts and decide on the forms of keeping and stating accounts; grant warrants for money to be paid out of the Treasury, in pursuance of appropriations, and countersign all checks drawn by the Treasurer; prescribe the formalities of the transfer of stock; make to the General Assembly full reports on all these proceedings and of the state of the Treasury Department within ten days after the commencement of each Session; "and perform such other duties as shall be prescribed by law." The provisions of Section 1 and Section 2 of Article VI did not originate in the Constitution of 1867. They are to be found in Article VI, Sections 2 and 3 of the Constitution of 1864, and they are practically copied verbatim from Article VI, Sections 1 and 2 of the Constitution of 1851. It was by the latter Constitution that the office of Comptroller was first established, and the debates of that Convention show the purpose of it. The report was made by Mr. McLane, Chairman of the Committee on the Treasury Department, and in his explanation of it, he

said that some reorganization of the Treasury Department was indispensably necessary,and that in the Treasury of the United States and in 23 states out of the 31, then existing, it had been found necessary to provide, in addition to a Treasurer, a Comptroller or some similar officer. Debates Maryland Reform Convention of 1851, Vol. 2, page 815. There was further discussion of the proposal by other members of the Convention, especially by Mr. Randall, who outlined the existing situation, and the fact that the Treasurer was without check or limitation. It was intended that the Comptroller was to have general superintendence over the fiscal affairs of the State. Debates Volume 2, pages 830, 831, 833.

Until 1937, the duties of the Comptroller were mainly those of superintendence and checking. In that year, the State Income Tax was adopted by Chapter 11 of the Special Session. The Comptroller was authorized to administer it and returns had to be made to him. This was the first instance of the extension of the duties of Comptroller from superintendence to actual assessment and collection. This change was criticized by the Maryland Tax Revision Commission of 1939, and in its report it recommended a new department of revenue and taxes which should take over the assessment and collection provisions of the income tax. In respect to the office of the Comptroller, the Commission said "The primary function of the Comptroller is to approve all vouchers drawn on the Treasury, and as a member of the Board of Public Works he exercises supervisory authority over all the State Departments, under Chapter 64 of the Acts of 1939. The Commission believes that the Comptroller should be relieved of the duties of tax assessment. This is foreign to the nature of his office and necessarily infringes on the other important work which he is required to perform." Report of the Commission, page 13. This recommendation of the Commission was, however, not adopted, and under Chapter 277 of the Acts of 1939, the Comptroller was continued in charge of all income tax activities. Since that time the duties of the Comptroller

have been enlarged by directing him to collect not only the income taxes, but the sales tax, Acts of 1947, Chapter 281, as well as some amusement taxes and some liquor taxes. At the present time the income tax and the sales tax are the most productive source of state revenue. In view of these enlarged duties, the Comptroller's office is now vastly different from its nature in 1851, or 1864, or 1867. He is, of course, still the chief fiscal authority in the State, and the check on the Treasury, and he has not only all the specific duties mentioned in the Constitution, but he has, added to these, the collection of enormous sums in taxes, and his office requires the employment of much more clerical assistance. According to the Budget of 1949, in his general department there are 14 employees, 4 in his license bureau, 2 in his bureau of revenue estimates, 8 in his gasoline tax division, 12 in his alcoholic beverages tax division, 22 in his income tax division, 6 in his admissions tax division, and 35 in his sales tax division, or a total of 135 employees. The population of the State has greatly increased, and, therefore, the amount of work necessary to be done to collect taxes has also greatly increased. When these conditions began to increase his work, the Comptroller then in office started to establish branch offices for some of his separate divisions in Baltimore, and the present Comptroller now proposes to put his income tax division there. The sales tax division has always been there, but if the appellants are correct in their contention, all of the divisions will have to be brought to Annapolis. The petition is not quite definite in its allegations as to how they are to be provided for, but it states that if there is not sufficient room in the State Office Building, other space can be obtained in the City. This may be true, but in all probability, additional buildings would be required.

The appellants say that the provision in the Constitution is mandatory, that the Comptroller must keep his office at the seat of Government, and, therefore, he cannot have any department offices elsewhere. We are not disposed to quarrel with their contention that the Con-

stitution is mandatory, and that its provision must be literally obeyed. That has been decided too many times to require any further discussion now. *Archer v. State,* 74 Md. 443, 22 A. 8, 28 Am. St. Rep. 261; *Buchholtz v. Hill,* 178 Md. 280, 285, 286, 13 A. 2d 348. But that is not the be-all and the end-all of the matter. The question is what the Constitution means by the Comptroller's office, and whether, no matter what changes have occurred in his duties, and in the amount and nature of his work, he is still bound to keep all of his employees at the seat of Government, and to do all of his work there, irrespective of its nature, irrespective of its magnitude, and irrespective of the best interests of the State. To put it more simply, perhaps, does "office" mean "main office" alone, or does it mean all branch offices and all departmental offices? Appellants contend it means all.

There would seem to be no question that the framers of our several constitutions from 1851, intended that the specific duties which the Comptroller had then and which are enumerated in the Constitution, should be performed at the seat of Government. And there are other provisions in the Constitution which indicate that is so. The records of the Comptroller's office should be kept where they are convenient to the Governor and to the Legislature, since it is made the duty of the Governor, as well as of the Legislature, to inspect and examine the accounts of the State. But to hold that all added duties provided by the Legislature, including those of a different nature, to wit, the assessment and collection of various taxes, were intended necessarily to be performed at the seat of Government, is to attribute to the members of the constitutional conventions, an utter lack of foresight, and of recognition of the possibility of growth or change of conditions in the State. They did recognize this possibility by providing for other duties to be placed upon the Comptroller by the Legislature, and it would be a narrow view of the wisdom of our forefathers to say that no thought crossed their minds of any enlargement of the enumerated duties or of any possible new duties

**148**

which in their nature and extent, might require the Comptroller to perform them in part elsewhere. We have heretofore indicated that there must be a certain amount of elasticity in the Constitution, due to necessary changes in the economy of the State. *Clauss v. Board of Education*, 181 Md. 513, 523, 30 A. 2d 779. We have ascribed foresight to the members of the Legislature of 1872. *State Tax Commission v. Western Maryland Railway*, 188 Md. 240, 52 A. 2d 615. We know of no reason why less prescience should be attributed to the members of the Constitutional Conventions. We think we would be maligning our forefathers if we should ascribe to them the strict and narrow intention contended for by appellants, and we, ourselves, would be going backwards. "* * * wise men have enough to do with things present and to come: therefore they do but trifle with themselves that labor in past matters." Bacon's Essays Civil and Moral "Of Revenge."

If the Comptroller now finds it necessary to establish branch offices or departmental offices in Baltimore City, or in other portions of the State, where it is more convenient and for the best interests of the State that they should be established, we are unwilling to say that the men who comprised the constitutional conventions intended to forbid that. We believe what they intended was that the main office of the Comptroller, the place where the books and records of the State are kept, the place where they could be examined, should always be at the seat of Government. But we do not think they intended to so limit him when new duties or the extension of old duties made it necessary or advisable to have some of the work imposed on him, done elsewhere. Other and different duties carry with them the necessary implication that they are to be performed in the manner and in the places which best serve the interest of the State. The appellants say that such a conclusion as this may result in the Comptroller maintaining one room in Annapolis, using a watchman, and doing all his work elsewhere. We cannot assume such a *reductio ad absurdum*, and the

Constitution would clearly forbid such a situation. But there is no authority in the judiciary to control the members of the executive department in carrying out their duties, so long as no plain violation of the Constitution or the law is found to exist. The specific transfer, to which the appellants object, is that of the income tax division. One of the ways in which the state income tax has been efficiently collected, is by establishing a liaison with the Collector of Federal Income Taxes, whose records are available for certain purposes to the Comptroller. The Federal Collector's office is in Baltimore, and it may be that this fact has something to do with the Comptroller finding it advisable to move the income tax division there. Whether or not that is the case, it is an administrative matter which we do not find prohibited by the State Constitution, and, therefore, which is none of our concern.

Since the oral argument in this case, Chapter 29 of the Acts of 1950 has been enacted, to take effect June 1, 1950. This statute provides that the Comptroller shall return to Annapolis the admissions tax division, the alcoholic beverages division and, for the income tax division, office facilities and personnel sufficient to serve the citizens and taxpayers of Southern Maryland and of the Eastern Shore. The provisions of this act are not yet in force, and it does not require the Comptroller to keep at Annapolis the entire income tax division, so that it does not, in any sense, make the question before us in this case moot.

A further argument is made by the Comptroller that for a number of years past he has maintained branch offices of one kind or another in the City of Baltimore, and that the Governor and the Legislature have made appropriations for the rental of these offices. Therefore, he contends there has been an executive and legislative interpretation of long standing of the constitutional provisions, and this should be followed. This is emphasized by Chapter 29 of the Acts of 1950, hereinbefore referred to. The omission to include the entire income

150

tax division in the requirement of the statute indicates an interpretation by the law making power that unless required to do so by statute, the Comptroller can perform the duties imposed on him by legislation elsewhere than at the seat of Government. We have frequently recognized the value of such interpretations in cases before us, although there is some difference in the interpretation of statutes and in the interpretation of constitutional provisions, and a positive, definite and clear provision of the Constitution cannot be changed by wrong practice and interpretations placed upon it. *Somerset County Commissioners v. Pocomoke Bridge Company*, 109 Md. 1, 71 A. 462, 16 Am. Cas. 874; *Maryland Theatrical Corporation v. Brennan*, 180 Md. 377, 388, 24 A. 2d 911. We do not, however, think it necessary to invoke this principle in the case before us because we think the interpretation placed upon the constitutional provision by the Comptroller and his predecessors and by the Governor and by the Legislature correctly interprets the meaning of that instrument.

For the reasons given, the order will be affirmed.

*Order affirmed with costs.*